IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 09-cr-00526-MSK

UNITED STATES OF AMERICA,

   Plaintiff,

v.

1. PATRICK LOVE;
2. JAMES LOVE;
3. PATRICK EGAN; and
4. MARK DOUGLAS REILLY,

   Defendants.

---

**OPINION AND ORDER DENYING, ON RECONSIDERATION, MOTION
FOR ISSUANCE OF SUBPOENAS**

---

**THIS MATTER** comes before the Court pursuant to what is effectively a request by the Government for reconsideration of the Court's Order **(# 52)** granting the Defendants' Motion for Issuance of Subpoenas **(# 51)**.[1]

The Defendants are charged with various counts of trafficking in and receiving

---

[1] Because the motion was captioned as a "joint motion" (a non-specific designation that is sometimes used to reflect the concurrence of both Government and defense in the relief requested, and other times to reflect the concurrence of all defendants – but not necessarily the Government – in the relief requested) and because the body of the motion gave no indication as to the Government's position regarding the request (a practice that, although not compelled by rule, is common in this Court), the Court incorrectly assumed that the request was unopposed and reflexively granted it. The Government then promptly moved **(# 54)** to stay the effect of that Order, and the Court granted **(# 55)** that request pending further briefing on the merits of the Defendants' motion for subpoenas. The Government has since filed a substantive response **(#57)** to the Defendants' motion, and the Defendants have filed a reply **(# 58)** in further support.

1

counterfeit goods – namely, counterfeit computer networking products falsely claiming to have been manufactured by Cisco Systems, Inc. 18 U.S.C. § 2320, § 545. The Defendants request that the Court permit them to issue subpoenas *duces tecum* to Cisco pursuant to Fed. R. Crim P. 17(c). The documents requested by the Defendants can be roughly grouped into three categories: (i) documents relating to Cisco's participation in the investigation of the underlying conduct[2]; (ii) documents relating to Cisco's pricing of the products at issue[3]; and (iii) documents relating to the manufacture and identification of genuine Cisco products as distinguishable from

---

[2]Specifically, request 1 seeks "all e-mails, written correspondence and documents or data from March 2006 to December 15, 2009 relating to any investigation Cisco made itself or initiated" relating to the Defendants. Request 2 seeks "all memorandum of understanding between Cisco on the one hand and the U.S. Department of Justice or any U.S. agencies on the other hand, in relation to" the investigation of the Defendants. Request 3 seeks similar memoranda of understanding between Cisco and Canadian law enforcement authorities. Request 4 seeks "all emails, written correspondence and documents or data from June 2005 to present, exchanged between any agent or employee of Cisco and any agent or employee of the United States or Canadian law enforcement in relation to" the investigation of the Defendants. Request 5 seeks "all emails, written correspondence and documents or data, from March 2009 to December 15, 2009, related to Cisco's utilization of [specified individuals and entities] in 'undercover buys.'" Request 7 seeks "all emails [and other correspondence] from 2004 to present, exchange between any agent or employee of Cisco and any agent or employee" of other specified corporate entities whose connection to this action is unclear. (The Defendants' motion mentions these entities only in the context of stating that an ongoing investigation involving counterfeit Cisco products is continuing in other Districts and "involves entities such as" those listed in Request 7. It is not clear whether that "involve[ment]" of those entities is as a target of the investigation or as assistance to the Government's investigation.) Finally, request 13 seeks "all notes, reports or memorandum of interview prepared by an agency or employee of Cisco who attended an interview of a witness in the investigation of the defendants in this case, including but not limited to" 12 specifically-identified individuals.

[3]The requests in this category are request 6, which seeks "Cisco's written policies and/or procedures, from 2004 to present, regarding the so-called Grey Market and counterfeit products"; request 11, which seeks "all [correspondence], from 2004 to present, regarding China's 'third-shift' activities"; request 12, which seeks documents "from 2004 to 2007, containing Cisco's internal cost and pricing for" 7 specific categories of products; and request 14, which seeks "a list of all Cisco factories located in China and the specific part made at each location."

2

the counterfeit products at issue here.[4]  The Government opposes the Defendants' request.[5]

Fed. R. Crim. P. 17(c) permits the Court to authorize a subpoena to be issued to a witness, directing the witness to produce documents, records, or other physical things in court. The rule is intended to "expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials," but is not a "means of discovery for criminal cases."[6] *U.S. v. Nixon*, 418 U.S. 683, 698-99 & n. 11 (1974).  To demonstrate an entitlement to a subpoena,

---

[4]The requests in this category are requests 8, 9, and 10, which seek documents exchanged between Cisco and U.S. and Canadian law enforcement officials "regarding the examination of counterfeit products and/or training in the detection of counterfeit Cisco products," and documents "regarding Cisco training of Technicians and Engineers in the identification of counterfeit Cisco products."

[5]The Court has some doubt as to whether the Government truly has standing to oppose a request for the issuance of a Rule 17(c) subpoena to a third party.  *See e.g. U.S. v. Tucker*, 249 F.R.D. 58, 60 n. 3 (S.D.N.Y. 2008) ("A party generally lacks standing to challenge a subpoena issued to a non-party absent a claim of privilege or a proprietary interest in the subpoenaed matter").  Admittedly, the question is one which has elicited a variety of judicial approaches. *Compare Tucker*, *id.* (court has *sua sponte* obligation to ensure that subpoena requests are proper even in absence of Government's standing to challenge) *with U.S. v. Smith*, 245 F.R.D. 605, 611 (N.D.Oh. 2007) (finding government had standing to challenge Rule 17(c) subpoena issued to individual identified as trial witness, but no standing to object to subpoenas directed at two other individuals who were not identified as trial witnesses) *and U.S. v. Orena*, 883 F.Supp. 849, 869 (E.D.N.Y. 1995) (Government has standing to contest request for third-party subpoena where subpoena "might have the effect of unduly lengthening the trial" and might have the effect of "unduly harassing" a trial witness).  However, the Defendants have not objected to the Government's standing to interpose objections to the subpoena request.  The Court assumes, without necessarily finding, that it has the inherent authority to deny the Defendants' motion *sua sponte* as insufficiently supported regardless of whether the Government has standing to be heard in opposition.

[6]These two observations are somewhat inconsistent.  The Court in *Nixon* apparently endorsed a comment by a member of the Advisory Committee that the "purpose of the Rule was to bring documents into court in advance of the time that they are offered in evidence . . for the purpose of enabling the party to see whether he can use them or whether he wants to use them." *Id.* n. 11.  It seems, to this Court, that directing the production of evidence prior to trial in order to permit the opposing party to examine the evidence and determine whether he can and wants to use it is the very definition of "discovery."

3

the party requesting it must show: (i) that the documents are evidentiary and relevant; (ii) that they are not otherwise available; (iii) that the party cannot properly prepare for trial without advance inspection of the documents and that production of the documents at the time of trial would unreasonably delay the matter; and (iv) that the application is not intended as a general "fishing expedition." *Id.* at 699. Courts interpreting *Nixon* have distilled the inquiry into three elements: (i) relevance, (ii) admissibility, and (iii) specificity. *U.S. v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002).

The Court finds that the Defendants have not met all of the requirements with regard to their requests. The charges in this case arise primarily under 18 U.S.C. § 545 and 18 U.S.C. §2320. The elements of a violation of 18 U.S.C. § 545 are, in essence, the importation of merchandise "contrary to law," and a defendants' receipt or redistribution of such merchandise with knowledge of its status. A violation of 18 U.S.C. § 2320, in summary, requires intentional trafficking in goods that are known by the defendant to have a counterfeit mark. To demonstrate that the material they request would be relevant at trial, then, the Defendants must show that the requests are directed at obtaining evidence that would demonstrate the absence of one or more of these elements. The first category of requests – those relating to the investigation of this matter – has no bearing on the elements of the charges against the Defendants and those requests appear to be entirely irrelevant to the charges to be presented at trial.[7]

---

[7]The Defendants have posited – and then withdrawn **(# 58)** – a vague suggestion that Cisco personnel unduly influenced the investigation of this matter and the bringing of charges against them. At present, there is no meaningful indication that the Defendants require the information requested in the first category of documents to file any specifically-identified pretrial motions.

Arguably, the Defendants might attempt to impeach certain witnesses at trial by showing that the Government's investigation was unduly influenced by Cisco personnel, resulting in the

The second category of requests, regarding Cisco's "policies regarding the Grey Market and counterfeit products" are also irrelevant. The Defendants appear to intend to argue that they legitimately acquire and sell genuine Cisco products acquired at a discount through "grey market"[8] channels, and believe that Cisco instigated this prosecution in an attempt to stamp out "grey market" vendors who undercut Cisco's profits from sales through authorized dealers. But Cisco's motivations, regarding the "grey market" or otherwise, are irrelevant to the charges herein, which assert that the Defendants were selling <u>counterfeit</u> Cisco products.

Conceivably, the charges give rise to two primary lines of defense: the products were not, in fact, counterfeit; and/or the Defendants were not aware of any such counterfeit status. The fact that the Defendants were normally engaged in lawful "grey market" sales of <u>genuine</u> Cisco products, or the fact that Cisco had a profit motive to eliminate legal "grey market" sales does not bear on questions of whether the products at issue here were counterfeit and whether the Defendants were aware of that fact. At best, Cisco's motives might provide fodder for impeaching the credibility of certain testimony by some Cisco-affiliated witnesses, but again,

---

erroneous assertion of charges against the Defendants. But even in that situation, there is only the most tenuous connection between the material being requested and any particular defense the Defendants might assert on this point. Moreover, even assuming that some information relating to Cisco's involvement with the investigation might be relevant, the Defendants have failed to show the required "specificity" element with regard to the requests, rending them unduly overbroad as discussed below.

[8]Definitions of the "grey market" may vary, but in general, the "grey market" results when a manufacturer offers essentially identical products at different price points in different markets – *e.g.* attempting to sell the product at a higher price in wealthier markets and at a lower price, more reflective of local standards of income, in less wealthy markets. Grey market dealers might purchase quantities of the product at the lower price in the less wealthy markets and ship the product to the wealthier market for re-sale, pocketing the difference. In many respects, grey market sales are not inherently unlawful, even though they somewhat defeat the manufacturer's attempts to reap the profit from sales to the wealthier markets.

that tenuous connection to the charges in this case prevent the Court from concluding that the broad requests in the second category are both genuinely relevant and sufficiently specific.

In this respect, the Defendants arguments here are similar to those of the defendant in *U.S. v. Gonzalez-Acosta*, 989 F.2d 384, 388-89 (10th Cir. 1993). There, the defendant was apprehended when a drug-sniffing dog alerted police to examine her vehicle, and the defendant then confessed to carrying drugs in a modified gas tank. In advance of a suppression hearing relating to the search of her vehicle by the drug dog, the defendant sought a Rule 17(c) subpoena to obtain "training records, veterinary records, false-positive/false-negative alert records and all other records establishing the dog's ability to smell." *Id.* at 388. (The defendant's theory was that "the dog had been recovering from a serious injury and had false-alerted upon the initial contact with her vehicle." *Id.*) The trial court denied the request, finding the requested documents irrelevant, and the 10th Circuit agreed. The 10th Circuit noted that evidence of any prior errors by the dog were irrelevant because the dog was certified for use on the day in question and because it had indeed alerted correctly on the defendant's vehicle. *Id.* at 389. The court also found that the lack of documents did not prevent the defendant from adequately cross-examining the dog's handler regarding the defendant's theory of defense. *Id.*

Much like *Gonzalez-Acosta*, where the fact that the dog correctly alerted on drugs that were actually in the defendant's vehicle overshadowed any argument that the dog might have been inaccurate or unreliable in other circumstances, any probative value of examination into any animosity of Cisco towards the Defendants here is overshadowed by the simple fact that the Cisco products at issue here were indeed counterfeit (at least according to the Government). The counterfeit Cisco products, like the drugs in *Gonzalez-Acosta*, are contraband by their very

6

nature, and a defendant found to be in actual possession of those items cannot avoid culpability for such possession by pointing out nefarious motives by others investigating the situation. Accordingly, the Court finds that the second category of documents requested by the Defendants are also irrelevant.[9]

The third category of requests – those relating to training given by Cisco to its own employees and to law enforcement officials to identify counterfeit products – might, in the abstract, be relevant here. As discussed above, a cognizable defense in this case might be that the products at issue are not actually counterfeit. If the determination of whether a product is counterfeit or not rests almost entirely with Cisco personnel – *i.e.* because law enforcement and outside officials lack the knowledge to discern genuine Cisco products from counterfeit ones – the Defendants may be entitled to explore the methodology by which those witnesses attesting to the counterfeit nature of the products reached their conclusions. (This is particularly so where the Defendants have raised a colorable contention that Cisco has a fiscal incentive to obtain a conviction of the Defendants who are, in essence, Cisco's competitors.) At least in the abstract, then, the Court finds that the material requested in the third category could be relevant.

However, the Court finds that the third category of requests fails on the "specificity"

---

[9]In a limited sense, a portion of request 12 might be relevant: that request seeks documents regarding "Cisco's internal cost and pricing" for certain products, presumably those at issue here. Cisco's internal costs for these products are completely irrelevant to the counterfeiting charges at issue. But the prices Cisco charges to dealers for the products might be relevant to the charges herein, as the Government may be pursuing a theory that the large price disparity between the products sold by authorized Cisco dealers and the products purchased by the Defendants should have put the Defendants on notice that the products they were buying might not be genuine. Assuming that the prices charged by Cisco's to its authorized dealers is relevant, however, the Defendants have not shown that that external pricing information is not otherwise available from other sources, as is required before a Rule 17(c) subpoena can issue.

7

prong of the analysis. In this regard, *Morris* in instructive.

In *Morris*, the defendant sought a Rule 17(c) subpoena to obtain, among other things, "all records regarding the FBI's investigation into" an incident in which an undercover agent shot the defendant in the course of attempting an arrest. In affirming the trial court's refusal to issue the subpoena, the 10th Circuit concluded that, even if the requested information was relevant and admissible, the defendant's request was insufficiently specific. The court explained that "*Nixon* mandates that the party requesting the information identify the item sought and what the item contains, among other things." *Id.* at 991. It found that "not only is [the defendant] unable to specify what the items he requests contain, he is also unable to verify whether the requested material even exists." *Id.* Concluding that the defendant was "attempt[ing] to use the Rules 17(c) subpoena for impermissible discovery purposes," the court concluded that the defendant had failed to overcome the specificity requirement.

In essence, *Morris* teaches that to meet the specificity requirement – and to dispel any notion that the request is being used as discovery or a "fishing expedition" – the Defendants must specifically identify what they believe the subpoenaed evidence will show. This ensures that a Rule 17(c) subpoena is used for its intended purpose: compelling the production of particular evidence that a party knows exists or has reason to believe exists. Here, the Defendants do not indicate what they expect the evidence regarding Cisco's training documents and records will reveal. Thus, it appears to the Court that the request for training records is nothing more than an impermissible attempt to use Rule 17(c) to conduct a "fishing expedition"

into the issue.[10]

Accordingly, the Court finds that the Rule 17(c) subpoena currently requested by the Defendants is improper, and thus, having reconsidered the matter, the Court **DENIES** the Defendants' Motion for Issuance of Subpoenas **(# 51)**. The Court expresses no opinion as to whether a more narrowly-focused and specifically-supported request for a Rule 17(c) subpoena on Cisco might nevertheless be granted.

Dated this 13th day of May, 2010

BY THE COURT:

*Marcia S. Krieger*

Marcia S. Krieger
United States District Judge

---

[10]Ultimately, to the extent that the identification of counterfeit products requires the person making such identification to exercise independent judgment based on training or expertise, that testimony would appear to be opinion testimony subject to the strictures of Fed. R. Evid. 702. As such, the Government would be required, as part of its disclosures under Fed. R. Crim. P. 16(a)(1)(G), to supply the defense with information as to the training and expertise of the person making the identification, as well as his or her methodology and the facts he or she relied upon. This disclosure will provide the Defendants with all of the information necessary to respond to any proffered opinion testimony that the products were counterfeit, rending the instant Rule 17(c) request redundant and overbroad.